Johnston, Chancellor.
The object of this bill is, 1st, to set aside the judgment confessed by Evans to the sureties to the second bond, and the assignment in trust, executed by him to John M. De Saussure; 2d. To charge certain of the claims *against Evans, as Commissioner, to his sureties for his first term of office, instead of his sureties for his second term.
I. If the assignment stands, the judgment by confession must, for the last is less assailable than the first. I shall therefore confine myself to the assignment. 1 Kent Com. 420.
It is not denied that a debtor, in failing circumstances, may, by assigning his estate in trust, prefer one creditor over another, if the assignment be executed in good faith, and if it destroy no existing lien, unless there exists, in the country, a bankrupt, or other law, prohibiting a preference. Seaving v. Brinkerhoff, 5 J. C. R. 332.
We have no law prohibiting a bona fide preference of one creditor over another. “ Undue” preferences are prohibited: which word “ undue” has been construed-to mean only fraudulent preferences. P. L. 457; 2 Brev. 137; 2 M’C. R. 366.
That liens did exist at the term of the assignment, the assignment itself recites. But I do not perceive evidence that any of the claimants before the Court held liens at that time. Some of them, the Insurance *285 Company, for instance, had obtained orders that Evans should pay over to them moneys in his hands as Commissioner; but this formed no lien on his property. The only effect of such orders, was to subject him for failure to obey them, to process in personam. Although, upon the foot of the orders, proceedings might have been instituted against him, which would have eventuated in judgments which would have bound his property, the orders themselves formed no liens.
The claimants here, having no liens at the assignment, cannot take advantage of liens held by persons not before the Court, to set the assignment aside — throw the assigned property into assefs, and thus entitle themselves to a share of it.
The assignment not being affected by existing liens, is it affected by any other circumstance ?
The first objection to it is, that it was fraudulent, inasmuch as it was intended to indemnify his sureties, at the expense of the very persons whom, by the spirit of their undertaking, the sureties were bound to protect.
The arguments of counsel on this point could not fail to produce a powerful effect on the Court. But however strong may be the appearance of policy and justice, by which they *are supported, it must never be forgotten that to the judicial tribunals the people have not delegated a particle of legislative power. The question for the Court is, what is the law ? Whatever the law is, that is what the sovereign authority has decided as its rule of policy and justice. Whenever that authority ceases to consider its rule as either politic or just, it can and will change it. The power of repeal or amendment is with it, to be exercised through the Legislature, and not with the judiciary.
Whether it is fraud for the surety of an insolvent officer to take an assignment of his property, for. indemnity, is the precise questioned negatived in Hooe’s case, 3 Cranch, 73, a case of great interest, and decided upon full consideration.
But the assignment from Evans is attacked on its terms. The provisions objected to are — 1st. The power given to the trustee to sell upon such credit as he may deem fit. 2d. The declaration that after paying off the existing liens, and' indemnifying the sureties, such creditors as would, within a year accept, should be paid rateably.
It is said that these provisions tend to delay and hinder Evans’ creditors in their remedies.
1. The power given to the trustee to sell upon such credits as he may deem best, is not to be construed as necessarily intended to delay the creditors. It maybe and ought rather to be considered as one of the means of advancing their interests, by procuring the best price for the property. To say that the trustee might abuse this power, is no argument against the trust itself. If he had attempted to act captiously or fraudulently under his power; if he had shown, in any way, that he was not governed by a sound discretion, or that he was disposed to defraud the creditors, who are his cestui que trusts, they could have enforced an honest execution of his duties. This was a sufficient safeguard to the creditors against fraud.
“It may be said,” with truth, American Jurist, No. 16, p. 295, “that every conveyance, in trust for creditors, interposes a delay, and necessarily retards them in the prosecution of their remedies.” But “if any *286 creditor complains of this, tbe ground of bis complaint must be, that be *s ^ePr^ve^ opportunities of securing *his whole debt, at the expense of other creditors equally meritorious. He is prevented from making use of an advantage against other creditors, not from enforcing his rights against the debtor himself. ”
2. The declaration that the residue after paying off liens and indemnifying the sureties, should be distributed rateably among such creditors as would accept within a year, does not, in my opinion, vitiate the assignment.
The argument is, that it was an attempt to drive the creditors into terms : and decisions are referred to in support of this position. I think the decisions do not support it.
In Lord v. The Watchman, American Jurist, No. 16, p. 284, “there was a condition in the assignment, that 'all creditors who became parties to it, thereby released the assignor from all further claim of the demand.” There was an attempt to drive the creditors into terms. The terms to which they were attempted to be driven was a release of their claims, and if they did not accept on that condition, they were to be excluded.
The case turned upon the attempt to coerce the creditors to release. Ib. 292-4-5.
In Hyslop v. Clark, 14 Johns. R. 458, 463, the assignment contained a similar condition ; and the judgment turned on it.
Seaving v. Brinkerhoof, 5 Johns. C. R. 329, was on a conveyance containing a condition that creditors should not take unless they released. There existed liens, and the decision partly turned on them : but that has no application here. The condition compelling a release was the principal, and only other ground of setting the conveyance aside, or enjoining, which is the same thing.
Mr. Justice WARE, who decided Lord v. The Watchman, says, the assignor “ had a right to lock up his property against any one creditor, for the benefit of all, and he had a right to determine the order in which his creditors should be paid out of the trust fund.” He says, “Lord transferred the whole of his property to Watts and Pray, in trust for the purpose, first, of paying such creditors as should become parties to the deed, in the order of preference established by the assignment. Thus far, it is admitted, he had a right to go.
In another part of his opinion, the same learned judge shows most distinctly the ground upon which he set the assignment,* in that case, aside. “A creditor,” says he, “who is postponed, cannot avoid the conveyance, because he may take what the favored creditors leave for him, and still pursue his remedy, for what remains, against tjhe debtor.” But “ the debtor cannot compel a creditor to receive, in satisfaction for his debt, any thing short of the full amount due.”
Mr. Justice Van Ness, in delivering the opinion of the Court in Hyslop v. Clark, takes his ground thus, “ One object evidently was to coerce the creditors to acquiescence in the terms offered to them.” The language held to them is, “if you will release your debts, you may participate.” &c.
Now, for anything contained in Evans’ assignment, every one of his creditors, after accepting, would have been still at liberty to pursue Evans and any other property he then had or might subsequently acquire. Where then is the contrivance to drive any of them to terms ?
*287 The postponement of the claimants here to the liens and to the claims of the siireties was lawful. They were offered a Lair chance and an equal chance after that, if they would accept, hnd there was no condition annexed to the acceptance. If any of them chose to accept, he could still retain all his remedies for any balance which the assigned property left unpaid. If any of them chose not to accept, can he make it a ground to impeach the assignment, that by reason of others accepting while he stood back, he, himself, and not Evans, gave those others a preference over him ? I think not.
3. It is objected that the assignment is silent as to what is to be done with any overplus, that might exist, after paying the liens, the sureties and the accepting creditors — that, therefore, as to such overplus, a trust results to Evans, which is a preference of himself over his creditors, and avoids the assignment.
What results to Evans, and in what case is it to result ?
By the terms of the assignment any creditor is allowed and invited to come in, and take without condition of the assets, until his debt be fully paid, or the assets exhausted. If the assets do not hold out, there is nothing to result to Evans. If there is an overplus, the creditors who have been paid cannot complain. The only case in which anything could *result to Evans, without paying every creditor or exhausting the assets, would be when a creditor, to whom the property had been unconditionally surrendered, with an invitation to accept his whole debt or his just proportion of the assets, had defrauded himself by obstinately refusing to be paid.
But an assignment to be set aside must be fraudulent on the part of the maker. The person seeking to set it aside must show fraud in that quarter. It is not sufficient merely that he has been defrauded, if it turn out that all are innocent of that fraud but himself. All that a creditor has a right to expect of the law, is, that it secure him a fair chance to be paid, and a protection against the frauds of others. In this case, the assignment gave each creditor a fair chance, and no one has practiced any fraud on the creditor.
But it by no means follows from what I have said, that if there were any surplus in the hands of the trustee, the Court would permit that to go to Evans, in preference to any creditor who had not accepted. All that I have said is, that such creditor, in such case, cannot overturn the assignment.
If it were not clearly given up that the trust property has fallen short of the liens and the indemnity of the sureties, I would order the trustee to account for the assets, in order to decree payment to the creditors here, out of the surplus. But it is conceded there is no surplus. The assignment and confession of judgment must stand.
II. The second matter to be considered is, whether any of the claims are chargeable to the sureties of Evans’ first term of office.
Let us consider the.claims which it is contended should be so charged, separately.
1. The claim of the Charleston Eire and Marine Insurance Company. The fund was received and partly disbursed, during the first term of office, leaving a balance in Evans’ hands during that term.
On the 10th June, 1825, and during the first term, this Court id the *288 case (John and James Chestnut v. The Charleston Fire and Marine Insurance Company, and others,) in which the fund had been paid into Court, “ ordered that *the funds now in the hands of the commissioner, and such as may come into his hands, before the final report, be paid over to the Fire and Marine Insurance Company — subject to the rights of the contesting claimants, and subject to the further order of this Court.”
There is no evidence that the money was ever demanded from Evans by the Insurance Company.
The principles of Wright v. Hamilton, 2 Bailey R. 51, are as applicable to a commissioner as to a sheriff. That case is, therefore, an authority that a right of action could not arise to the Insurance Company against Evans, until demand of payment. If he was not liable neither are his sureties. But if no action could have been maintained against him, it was because he had committed no official default.
Then up to the last day of his first term, he was guilty of no default as respects this fund, unless it was misconduct to perform his duty, by receiving it and holding it until demand.
On the last day of his first term it was his duty to turn it over to his successor in office, (Act of Assembly, 1823.) But he was that successor himself. He, by this succession, became debtor himself, and creditor of himself. The person bound to pay, was then also the person to receive. Did he demand of himself ? What must have been the answer he gave himself? “The money is in your own pocket. You are paid. I have turned over the money to you. Give me a receipt: or if you cannot do that, charge yourself, in your books, as my successor, with the fund.”
How, if he had the money as successor, and being in office as successor, failed to charge himself with it, was not that a default in his second term ? And are the sureties for the first term to be charged, ex post facto, for that? Are they to be charged for the misconduct of the principal of another set of sureties ?
It appears to me the decision in Wankford’s case, 1 Salk. 229; 3 Ib. 262; and in Cobb’s case, 2 Bailey, 60, go to the discharge of the sureties for the first term.
2. The claims of the children of Willie Yaughan is still less tenable. *There was no order to pay out the fund received by Evans during his first term. There was no demand. Nor could any payment have been made to the children, they being infants.
3. Edward Newhall’s claim.
The fund was received during the first official term : no order made to pay out — nor any demand until the second term. Of course, upon the principles I have applied to the foregoing claims, this cannot be charged to the first set of sureties.
4. Tim. and F. Dwight’s claim stands on the same ground as New-hall’s.
5. So, also, does Thomas Scott’s.
6. John Hudson’s claim.
The fund was received during the first term of office : no order to pay out, nor demand made. The first set of sureties are not liable for this claim.
T.' H. M. and G. Archie’s claim.
*289 A thousand dollars were raised during the first term, and ordered to be invested. Evans only invested eight hundred ; which he received back again in the second term. It is not contended that the first sureties are liable for the eight hundred dollars. But it is contended that they are responsible for the two hundred, on account of Evans’ default in not complying with the order to invest them; and so they are; but not under the charges in this bill. No such default was alleged, and the proof must be rejected: 1 Br. C. C. 94; 14 J. R. 501; Gilb. 219; 6 J. R. 543; Mitf. Pl. 34; 2 Atk. 182; 2 Ves. 225; 11 Ves. 240.
8. The claim of Lene Dubose’s children.
Carter, who was Evans’ predecessor in office, was ordered to take charge of, and did take charge of these children’s slaves. When Evans came into office, he acted as Carter had acted, but without special order.
The slaves were hired out, and notes taken for the hire, which notes fell due the 20th March, 1823, in Evan’s first term. There is no evidence when these notes were paid, but they were paid, and the principal has been paid out. A claim is no w made for the interest which accrued from the maturity of the notes, until the principal was paid out. *And it is contended that the first set of sureties is liable for it — although there was no order to pay it, nor demand of it, during the first term of office ; neither was there any one to receive it, the children being minors during the whole of that term,
Although I think Carter’s acts in relation to the children’s property were in the line of his duty, as Commissioner, and that Evans succeeding him in office, succeeded to his duties ; yet there is no default proved in his first term, and his sureties for that term are not responsible for this claim.
9. The claim of the Commissioners of the Poor on account of John Craven.
The proceedings relating to this matter are very extraordinary.
Craven, a lunatic, had been, from 1812 to 1818, under the care of the Commissioners of the Poor. In 1818, he obtained (without the intervention of a committee, as it would appear,) a decree in this Court; under which the Commissioner of the Court, who preceded Evans, sold a tract of land, for his benefit, at §1120 dollars. The Commissioner supported him on the avails until Evans’ election. Then Evans took charge of the lunatic and the fund, and supported him on the latter until his death; which happened in-, during Evans’ first term.
After the lunatic’s death, and during his own first term of office, Evans reported to the Court, that the funds left, belonging to the lunatic, were, in cash, §116 06, and in bonds, besides interest, $213.
He also reported that the Commissioners of the Poor had a demand for §573 33, to the payment of which he recommended that the fund, after deducting the costs of Craven’s suit, should be applied, so far as it would go. This was ordered, although there does not appear to have been any administration to Craven taken out.
The costs of Craven’s suit left but §131 of the fund for the Commissioners of the Poor, from which it would seem that Craven’s capital was very much trenched upon.
The Commissioners of the Poor now demand the §131 from Evans’ *290 sm’eties, without ever having demanded *the money the first term of office. No default was committed during’ the first term, and the sureties for it are not responsible.
Wm. F. De Saussure, in support of these grounds,
argued, 1st, That the sureties to the first bond were liable for all moneys received by the Commissioner, during that term ; that it was the receipt of the moneys, and not the neglect or refusal to pay over, which fixed the liability of the sureties; and where there has been a demand made and a refusal to pay over, the default will have relation back to the time when the money was received. At all events, the refusal of the Commissioner to j>&y out money according to the order of the Court, was evidence of a conversion during that term, and his neglect to invest funds ordered to be invested, was a default in the first term, and were violations of the orders of the Court prescribing these duties, which constituted breaches of the condition of his bond, for which his securities of that term were liable. 2. That the assignment was void, as well from its terms, which were intended to coerce creditors to a compromise, as on grounds of public policy. That the community have the right to look as well to the private fortune of a public officer, as a security for his official conduct, as to his bond. And he cited and relied on, the American Jurist, No. 16, p. 284; 10 Johns. Rep. 459; 20 Johns. Rep. 442; 4 Dallas; 5 Johns. Ch. Rep. 329, 332.
*290 There is no ground, as respects the assignment, or as against the sureties, for the bill in this case ; and it must be dismissed as against all the defendants, but Evans. As against him it will be retained until further order.
The plaintiffs move to reverse this decree, and that the relief prayed by the bill be granted ; upon the following grounds :
1. Because the sureties in the first bond are liable for all moneys received by the Commissioner during that term, unless they show that the same were paid over to his successor.
2. Because the fact that Evans was his own successor, does not discharge the sureties to the first bond, unless by some schedule signed by the Commissioner at the expiration of his first term, and filed in his office, he had acknowledged the amount then in his hands and ready to be paid over; and by a receipt endorsed thereon, when he was re-elected, had admitted his receipt of those sums under his second term.
3. Because the receipt of money during the first term, charges the sureties; and the fact, that when called upon he is not able to pay, is conclusive evidence of default during that term, until- the contrary is made to appear.
4. Because an order to pay over, fixes the default during the first term, though no demand was proved to have been made.
5. Because the failure to invest money ordered to be invested, constituted an immediate default.
6. Because, whore bonds were lodged in the Commissioner’s hands during his first term, his first sureties are liable, unless they produce the bonds or the money.
1. Because the Court refused testimony which was offered to prove a default during the first term, by showing that Evans converted the funds in his hands to his own use, during his first term, and because the same evidence was offered to assail the assignment.
8. ^Because the assignment made in trust for the sureties ought to be set aside.
Blanding, contra.
As to the question, whether the securities to the first bond were liable — argued, that the breach assigned was that Evans had received money which he had not paid over according to the condition of his bond ; and that there could be no such breach when the creditors stood by, and did not set up their claims until the second term. As to the funds in his hands during the first term, which were ordered to be paid over, no cause of action accrued until after demand; Ramilton v. Wright, 2 Bailey, 51; and State v. Martin, Columbia, May Term, 1830. And as regards the order to invest funds, a failure to comply with it could only make the sureties to the first bond liable for the interest. Evans was his own successor, and the fund remaining in his hands until* the second term, his sureties to that term are liable. As regards the assignment, he insisted that there was no ground on which it could be impeached. It was executed bona fide for the benefit Of his creditors, of whom were his sureties ; and he had a perfect legal and equitable right to give preferences among his creditors, and indeed he might have paid in $10,000, and discharged his bond. There is nothing in the terms of the assignment to prevent creditors from proceeding against him, or to compel them to compromise their claims ; and, finally, if the assignment should be set aside, the securities are protected by the judgment confessed to them.
Harper, J.
It will be necessary to add very little to the very satisfactory reasoning of the Chancellor, on the several points involved in the case. The four first grounds of the motion, together with the sixth, may be considered together. If it were shown that the Commissioner had wasted or converted to his own use the funds officially in his hands, as by purchasing property with a bond -taken by him as Commissioner, during his first term of office, I should think the sureties of that term ought to be answerable. But in the absence of any testimony on the subject, the presumption is, that he retained the funds, and that they were in his hands as his own successor. Such seems to be the natural inference, and I think it is sustained by the authority of the cases to which ,the Chancellor refers. Such was the opinion of the presiding judge in the case of the State v. Martin,(a) and it is supported* in some degree by the case of The Treasurers v. Taylor, 2 Bailey, *292 524. What other conclusion could you draw ? By what data could you fix a default during the first term of office ? And what is the evidence here of default during the first term ? The strongest cases are those in which the Commissioner was ordered to pay over the funds. These orders were an authority to pay over the money, and made it his duty to do so, if it were .demanded. Certainly, however, it did not impose on him the duty of seeking out the parties wherever they might be found, and making a tender. According to the case of Wright v. Hamilton, 2 Bailey, 51, there was no default and no cause of action against Evans, till the money was demanded and he refused to pay it, and no demand was shown during the first term. Besides, as observed in argument, by their delay to make any demand of the sureties of the first term, and by establishing their demands against the sureties of the second term, the creditors have concluded themselves. If Evans had the funds in his hands during his second term of office, if he did pay over to himself as his own successor, the sureties of the second term were liable, and if they were liable, those of the first term could not be.
The fifth ground of appeal is, because the failure to invest money ordered to be invested, constituted an immediate default. I suppose it was so ; yet it does not follow that, for that the Commissioner was liable .to the extent of the money ordered to be invested. He might be liable ,to the parties for the interest which would have been made if the fund keen Pr°Perly invested; but no such claim is made in *this case. If he neglected to invest, the money remained in his hands, and the same presumption arises with respect to that, as to any other money in his hands.
The seventh ground has been abandoned since the hearing; the couusel having- become satisfied that the testimony which was offered could not have been given.
On the eighth ¡ground, it is not necessary to add anything to the reasoning Qf the Chancellor. The assignment was only impugned in argument, by supposing that it was intended to coerce creditors by requiring them to release part of their demand, before they could have the benefit of it. But this was plainly a misconception. The assignment is for the benefit of creditors who shall consent to accept (not accept and release) within a year; and this was proper, that the trustee might know for what creditors he was to provide.

 The State v. Martin, Commissioner and sureties—Before Mr. O’Neall, at York, Spring Term, 1830. This was an action on the official bond of the Commissioner in Equity for his second term of office, to recover money received by him and not paid over. The jury found a special verdict, which stated among other things, that a part of the money for which the action was brought was received by the Commissioner during .his first term, but was not ordered to be paid over until during the second term; and one of the questions made, was whether the suieties to the second bond were liable for the money received during the first term. The presiding Judge awarded judgment for the plaintiff; and an appeal being taken, in his"report of the case, on this point he remarks: “ Let it be admitted that he received the whole of the money during his former term and that he received part of *292 it in his own debt, what would be the effect of it? Upon his entering on his second tei-m, he had so rauoh money belonging to the complainants in the ease in Equity. Ho was ordered to pay it out in his second term, and for his failing to do so, his securities to his second bond would appear to be answerable for a breach of duty. See M’Dowell v. Caldwell, 2 M’C Ch. 43; Hall v. Hall, Ib. 269. During, however, his second term, on the 30th May, 1826, the Commissioner accounted with the executors and legatees of Feemster (for whose benefit this suit is brought) and admitted the balance of §,329 48, to be then in his hands as .Commissioner, for their use and benefit. This admission is conclusive on the defendants, and they are bound for the amount thus admitted to be in his hands, with interest thereon.” The judgment of the Circuit Court was affirmed, but the case was decided on other grounds. R.